UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------  X
DANIEL RIEGER,                                                :
                                                              :        20 CIV. 5745
                                        Plaintiff,            :
                                                              :
                   -against-                                  :        COMPLAINT
                                                              :        WITH JURY DEMAND
CAMGT 510 W42 RESTAURANT OPERATING                            :
LLC, CACHET HOTEL AMERICAS                                    :
CORPORATION, AND CACHET HOSPITALITY                           :
GROUP,                                                        :
                                                              :
                                        Defendants.           :
------------------------------------------------------------  X
```

Plaintiff, Daniel Rieger ("Rieger" or "Plaintiff") for his Complaint against CAMGT 510 W42 Restaurant Operating LLC, Cachet Hotel Americas Corporation, and Cachet Hospitality Group (collectively "Cachet" or "Defendants"), alleges as follows:

## THE NATURE OF THE ACTION

1.      Rieger brings this civil action against Defendants for retaliation against him for his role in opposing sexual harassment of a female employee of Cachet by the Chief Development Officer of Cachet, in violation of (i) Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* ("Title VII"); (ii) New York State Executive Law § 296 *et seq.* ("New York State Human Rights Law"); and (iii) the Administrative Code of the City of New York § 8-101 *et seq.* ("New York City Human Rights Law").

## THE PARTIES

2.      Plaintiff, Daniel Rieger, is an individual that resides in Westchester County, New York.

1

3.       Defendant CAMGT 510 W42 Restaurant Operating LLC is a limited liability company with its principal place of business located at 510 West 42nd Street, New York, New York 10036.

4.       Defendant Cachet Hotel Americas Corporation is a corporation with its principal place of business located at 501 Santa Monica Blvd., Suite 702, Santa Monica, California 90401.

5.       Defendant Cachet Hospitality Group is a business with its principal place of business located at 501 Santa Monica Blvd., Suite 702, Santa Monica, California 90401.

## JURISDICTION AND VENUE

6.       Jurisdiction is founded upon 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

7.       Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Rieger's claims occurred in the Southern District of New York.

8.       Rieger received Notice of Right to Sue from the United States Equal Employment Opportunity Commission, and is filing this Complaint within ninety days of receiving such Notice of Right to Sue.

## FACTS

**THE EEOC FOUND "REASONABLE CAUSE"**
**TO BELIEVE CACHET RETALIATED AGAINST RIEGER**

9.       At the conclusion of its investigation, the EEOC issued the following Final Determination finding reasonable cause to believe Cachet retaliated against Rieger in violation of Title VII for his reporting to management a sexual harassment incident of a Cachet female waitress by Cachet's male Chief Development Officer that included trying to bribe the employee with money in exchange for sex and unwelcome physical touching.

2

FINAL DETERMINATION

I issue the following determination on the merits of the subject charge.
Respondent ("Cachet Hotel Americas Corp. & Cachet Hospitality Group")
is an employer within the meaning of Title VII of the Civil Rights Act of
1964, as amended. All requirements for coverage have been met.

Charging Party alleges that he was retaliated [against]  by termination for
reporting a sexual harassment incident that occurred involving a Cachet
female employee. He commenced employment as the Director of Food and
Beverage for Cachet Hotel on September 5, 2018. On December 2, 2018,
he witnessed Cachet's Chief Development Officer portraying sexual
misconduct behavior against a Cachet female employee. This included
bribing the employee with money in exchange for sex. The Charging Party
reported the incident to a Managing Director. The Chief Operating Officer
was notified, and he took no action to remedy the harassment. On December
4, 2018, the Vice President of Food & Brand Management and a Human
Resources Manager both held a meeting with the Charging Party. They both
informed him of his termination stating they could not afford his salary.
Their developing outlets were not in operation at the time. Charging Party
alleges Cachet decided to hire two more new employees, one was a week
and a half apart prior to his termination, and Cachet also hired ("Alex Glen")
to fill in a Director of Programming position, after his termination.

Respondent denies discriminating against Charging Party. In its position
statement, Respondent asserts that the Charging Party lacked job
performance and failed to accomplish an effective Food and Beverage
operating procedures in place. Respondent claims Charging Party was hired
to oversee three Cachet venues to maintain high revenues, for which he had
caused a significant drop in revenue from one of the three venues.
Respondent also asserts they were going through a restructuring stage of
their company.

Respondent's asserted defense does not withstand scrutiny and the
**Commission has determined that there is <u>reasonable cause</u> to believe
that Respondent's <u>retaliation</u> against Charge Party, for having engaged
in a protected activity, in violation of Title VII of the Civil Rights Act
of 1964, as amended**.

This determination is final.

**<u>Rieger's allegations</u>**

10.     Rieger was employed by Cachet as the Director of Food and Beverage for its Cachet Boutique New York Hotel ("Cachet Hotel") located at 510 West 42nd Street for only about 3 months from September 5, 2017 to Cachet's termination of his employment on Monday, December 4, 2017 – only **2 days** after he was involved in reporting a serious incident of sexual harassment of a female Cachet employee by Cachet's male Chief Development Officer.

11.     On September 5, 2017, Rieger commenced employment as the Director of Food and Beverage for Cachet Hotel.

**The sexual harassment of a female employee by Cachet's male Chief Development Officer on Saturday, 12/2/17**

12.     On the evening of Saturday, December 2, 2017, Gabriel Galicot, Cachet's Chief Development Officer, walked into the Cachet Hotel restaurant Eden Local, had alcoholic drinks with others including an investor in the hotel and got extremely drunk.

13.     Galicot proceeded to put his arm around one of the waitresses, Madigan (Maddy) Zamora.

14.     She told him to stop.

15.     He ignored her request.  He told her that he was her boss, and that she needed to do what he said.

16.     He even put cash in her hand, and grabbed her and pulled her even closer to him. He gave her the cash as if to give her extra compensation in exchange for being more receptive to his sexual advances, in effect treating her like a stripper or prostitute.

17.     Ms. Zamora ended up crying outside the restaurant.

**Rieger's involvement in escalating the sexual harassment complaint on Saturday, 12/2/17**

18.     Ms. Zamora worked for Rieger since he was Director of Food and Beverage.

4

19.     Ms. Zamora complained to Rieger that evening about the sexual harassment incident.

20.     Rieger reported the incident by email and phone that evening to Kevin Fenton, Managing Director for the hotel and Rieger's supervisor on-site at the hotel.  Mr. Fenton and Rieger were the top two executives running the hotel.

21.     Roberto Boscolo, the Chief Operating Officer ("COO") at Cachet, was informed about the incident.  Mr. Boscolo spoke to Ms. Zamora and tried to make excuses for Mr. Galicot's behavior, telling her something along the lines of, "where Gabriel is from this often happens so maybe his actions were misconstrued."  Mr. Boscolo was referring to the fact that Mr. Galicot is Latin American.  (Mr. Boscolo is from Italy.)

22.     Ms. Zamora responded to Mr. Boscolo that that was "bs," as she was Latin too.

23.     Mr. Boscolo was not subordinate to any other executive at Cachet, and worked with Mr. Galicot at Cachet as two of its most senior officers.

24.     As Mr. Boscolo conducted no investigation and took no action against Mr. Galicot, Mr. Fenton reported the sexual harassment incident, as well as Mr. Galicot's inappropriate response to it, by email late that Saturday night, December 2, to other top officers of Cachet including the Chief Financial Officer ("CFO"), Martin Key.

25.     In his email, Mr. Fenton referred to Rieger's role in reporting the sexual harassment incident.

**Cachet failed to communicate with Rieger at all to investigate the sexual harassment complaint prior to (or even after) terminating his employment**

26.     The Cachet executives emailed Mr. Fenton on Sunday, December 3, 2017 that they would investigate and get back to him.

27.     However, Cachet did no investigation whatsoever.

28.     No one from Cachet communicated any further with Mr. Fenton or Rieger about the sexual harassment report.

**The termination of Rieger's employment on Monday, 12/4/17 without any warning --**
**<u>the very next business day after he was involved in reporting sexual harassment</u>**

10.     Instead, the very next day, on Monday, December 4, 2017, Cachet abruptly terminated Rieger's employment out of the blue with no notice or warning.

11.     About 10 minutes after Cachet terminated Rieger's employment, it also terminated the employment of Mr. Fenton – Rieger's supervisor who along with Rieger had escalated the sexual harassment complaint and complaint about the COO's response to it.

**The reasons given to Rieger for his termination were clearly pretextual, as he was included in many high-level discussions about the future of the hotel the week before until suddenly <u>being terminated almost right after escalating a sexual harassment complaint</u>**

12.     Alison Hunt, the Vice President of Food & Brand Management who was Rieger's supervisor from Cachet's corporate offices with whom he regularly had worked, was the person who communicated the termination to Rieger, in the presence of Vida Marcelo, a Human Resources/Payroll Manager.

13.     Ms. Hunt told Rieger that the reason his employment was being terminated was because some of the additional food and beverage outlets Cachet planned to open were not open yet, and so Cachet could not manage his salary.

14.     This reason was false and a pretext for retaliating against Rieger for his role in the sexual harassment complaint against one of the top executives of the company (Chief Development Officer Mr. Galicot), and against *the* top executive (COO Mr. Boscolo) for his mishandling and exacerbating the situation in response to the complaint.

15.     Ms. Hunt was crying when she terminated Rieger's employment.  This was clearly not just a run-of-the-mill cost-cutting termination.

16.     Also, prior to Rieger's termination, there had been no discussions with Rieger about any possibility of terminating his employment or even concerns about the cost of his salary.

17.     In fact, the opposite was the case.

18.     The week before the termination of my employment, Rieger participated in a slew of meetings with executives who worked in Cachet's corporate offices about various business planning issues.

19.     Many of those meetings included Ms. Hunt, who terminated Rieger's employment the following Monday.  During those meetings, neither Ms. Hunt nor anyone else gave any inkling that any decision had been made to terminate Rieger's employment.

20.     Some of those meetings included Mr. Boscolo and the CFO Mr. Key.

21.     Ms. Hunt even emailed Rieger more than once on Friday, December 1, 2017 after 6 p.m. with requests for things she wanted him to do on Monday, December 4 and the rest of that following week.

22.     Such a decision to terminate Rieger's employment clearly had not been made prior to the escalation of the sexual harassment complaint on the evening of Saturday, December 2. Otherwise, it would not have made any sense to include Rieger in all of these meeting with the corporate arm of Cachet.

23.     Indeed, Ms. Hunt was still emailing Rieger about long-term business planning the morning of Monday, December 4, the day she terminated his employment.

24.     The fact that the additional food and beverage outlets had not opened yet was not a new development that occurred on the day of Rieger's termination the very next business day after his involvement in the sexual harassment complaint.

25.     Cachet blatantly retaliated against Rieger for his role in opposing sexual harassment.

**The reasons Cachet gave to the EEOC for terminating Rieger's employment were provably false and pretextual**

26.     First, the November 30, 2017 email by Ms. Hunt that Cachet attached as Exhibit B to its EEOC Position Statement does not show that a decision to terminate Rieger's employment was made prior to the December 2, 2017 incident in which Rieger was involved in reporting sexual harassment.  That email doesn't even mention Rieger's name, or indicate that a decision had been made to terminate his employment.  Instead, in that email Ms. Hunt requests information to conduct an "analysis of the current situation."

27.     Second, Cachet's allegation in its EEOC Position Statement that Rieger reported to Ms. Hunt is false.  Cachet produced to the EEOC as Exhibit B to its response to the EEOC's request for information Rieger's offer letter, which provides that he reported to the "Managing Director."  The Managing Director was Kevin Fenton.

28.     Third, Cachet's allegations in its EEOC Position Statement that Ms. Hunt, prior to terminating Rieger's performance, had discussed "performance issues" with Rieger is false.  Cachet never gave Rieger any written warning about such supposed performance issues.  Mr. Fenton, who was Rieger's boss, did not raise performance issues with Rieger and was never informed by Ms. Hunt that she had issues with Rieger's performance.

29.     Fourth, Cachet's allegation that Ms. Hunt raised performance issues with Rieger in the termination meeting is false.  And she indeed cried at the termination meeting.

30.     Fifth, the performance issues Cachet raised in its EEOC Position Statement are false.

      a.     The clock-in system for employees indeed had major problems, as it went down a number of times and led to multiple hours of additional work each week

establishing the hours that the employees were on site weekly.  However, Rieger

not only was never asked for his input about the clock-in system, but he was

specifically told by Mr. Fenton that he had to use the existing system.

b.  As for the purchase order process Cachet raised in its EEOC Position Statement, it

was also set in place and went through an electronic system.  Rieger was told by

David Laris (the Chief Creative Officer of Cachet) and Abraham Merchant (owner

of the real estate where Cachet's hotel was located) not to get involved in any food

ordering.  Rieger was specifically told by Mr. Laris and Mr. Merchant, at a meeting

also attended by Mr. Fenton, not to involve himself with anything regarding the

back of house, and that labor and food purchasing would be high for the first 6

months and to mind his business and concentrate on the front of house leaving the

back of house to the Executive Chef Francis Tariga.

c.  Regarding the cash drop system Cachet raised in its EEOC Position Statement,

Rieger requested a standard operating procedure ("SOP") from Ms. Hunt on more

than one occasion.  He was sent SOPs by someone from Cachet corporate at Ms.

Hunt's request that were in another language before finally getting them partly in

in English and partly in Chinese, and the SOPs were for another property.  Mr.

Fenton told Rieger on multiple occasions that it was not Rieger's job to draft SOPs,

but rather it was Cachet corporate's job to provide them to Rieger.  Rieger requested

from Mr. Fenton on at least 3 occasions new safes, as the safes he was given were

not able to open or lock.  Mr. Fenton informed Rieger that he should use the same

system for the cash drops as the front desk of the hotel, so all cash drops were given

to the front desk to handle.  Rieger thus followed the directions of his direct superior

and did nothing wrong.

    d.   Regarding the stockade inventory management system Cachet raised in its EEOC Position Statement, within 3 business days of Ms. Hunt asking him to facilitate a new system, it was in place.  On a weekly basis, inventory was taken for all beverages, which was what Mr. Rieger was asked to do.

31.    Sixth, contrary to Cachet's depiction in its EEOC Position Statement, the emails from Ms. Hunt to Rieger in the few days prior to his termination on December 4, 2017 do indeed show that no decision had been made to terminate his employment prior to the December 2, 2017 sexual harassment incident.  Those emails included requests for things Ms. Hunt wanted Rieger to do on Monday, December 4 and the rest of that following week, and an email the morning of December 4 included long-term business planning.

    a.   Attached as Exhibit 1 to Rieger's EEOC Rebuttal was an email chain from November 30, 2017.  In it, Rieger was sent the link to all the hotel procedural documents, and Ms. Hunt was cc'd.  If Cachet had known already that Rieger would be terminated in a few days, it would not have given him access to these files and documents to download and edit.

    b.   Attached as Exhibit 2 to Rieger's EEOC Rebuttal was an email chain from December 1, 2017.  On Friday, December 1, Ms. Hunt assigned Rieger tasks to complete "on Monday" and also "mid next week."

    c.   Attached as Exhibit 3 to Rieger's EEOC Rebuttal was an email chain from December 1, 2017.  Again Ms. Hunt emailed Rieger with tasks to get done "next week" after the new Financial Controller was scheduled to start.

10

d.  Attached as Exhibit 4 to Rieger's EEOC Rebuttal was an email chain from December 4, 2017.  On the morning of the day when Ms. Hunt terminated Mr. Rieger's employment, Ms. Hunt asked Mr. Rieger to work on SOPs.

32.  Seventh, Cachet's claim in its EEOC Position Statement it could not justify Rieger's salary because the Playboy Club had not been opened is belied by its own actions.

a.  Cachet hired Alex Glen for the title of Director of Programming for Playboy a week and a half before Rieger was terminated.

b.  Also, only about a month after terminating Rieger, Cachet hired Zach Erdem to operate the Playboy Club -- a position Rieger had held.  Yet Rieger was let go.

c.  So Cachet's excuse of not being able to afford Rieger because the Playboy Club had not yet opened is pretextual.

**FIRST CLAIM**
**(Retaliation In Violation Of Title VII)**

10.  Rieger repeats and realleges the allegations contained above as if separately set forth herein.

11.  At all relevant times, Rieger was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

12.  Defendants are "employer[s]" under Title VII, 42 U.S.C. § 2000e(b).

13.  Rieger opposed sexual harassment of a female employee of Cachet by the Chief Development Officer of Cachet and engaged in protected activity under Title VII.

14.  Defendants retaliated against Rieger for having engaged in the protected activity by terminating his employment in violation of Title VII.

15.  As a result of these Defendants' retaliatory conduct, Rieger has suffered substantial damages, including emotional pain and mental anguish, in an amount to be determined at trial.

16.     Defendants' discriminatory conduct was taken with reckless indifference to Rieger's rights, entitling him to punitive damages under Title VII.

## SECOND CLAIM
### (Retaliation Under New York State Human Rights Law)

17.     Rieger repeats and realleges the allegations contained above as if separately set forth herein.

18.     At all relevant times, Rieger was an "employee" for purposes for § 292 of the New York State Human Rights Law.

19.     Defendants are "employer[s]" for purposes of § 292(5) of the New York State Human Rights Law.

20.     Rieger opposed sexual harassment of a female employee of Cachet by the Chief Development Officer of Cachet and engaged in protected activity under the New York State Human Rights Law.

21.     Defendants retaliated against Rieger for having engaged in protected activity by terminating his employment.

22.     Defendants' actions constitute retaliation against Rieger in violation of § 296(1) of the New York Human Rights Law.

23.     As a result of Defendants' retaliation, Rieger has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

24.     Rieger is also entitled to punitive damages.

## THIRD CLAIM
### (Retaliation Under New York City Human Rights Law)

25.     Rieger repeats and realleges the allegations contained above as if separately set forth herein.

26.     Rieger is a "person" under § 8-107(1)(a) and § 8-102(1) of the New York City Human Rights Law.

27.     Defendants are "employer[s]" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

28.     Rieger opposed sexual harassment of a female employee of Cachet by the Chief Development Officer of Cachet and engaged in protected activity under the New York City Human Rights Law.

29.     Defendants retaliated against Rieger for having engaged in protected activity by terminating his employment.

30.     Defendants' actions constitute retaliation against Rieger in violation of § 8-107(7) of the New York City Human Rights Law.

WHEREFORE, while reserving the right to seek additional damages as available, Rieger demands judgment against Defendants as follows:

1.     An award of Rieger's actual damages in an amount to be determined at trial for loss of compensation, benefits and professional opportunities, including back pay;

2.     An award of reinstatement or front pay in lieu of reinstatement;

3.     An award of damages in an amount to be determined at trial to compensate Rieger for his mental anguish, humiliation, embarrassment, and emotional injury;

4.     An award of punitive damages;

5.     An award of reasonable attorneys' fees and the costs of this action;

6.     An award of interest; and

7.     Such other and further relief as this Court may deem just and proper.


Dated: New York, New York
        July 23, 2020


                              LAW OFFICE OF MICHAEL GRENERT, PLLC

                              By:_____s/_____
                              Michael E. Grenert
                              214 W. 29th St., 2nd Floor
                              New York, New York 10001-5340
                              Telephone:  (917) 553-2050
                              Facsimile:  (917) 725-8525
                              Email:  mgrenert@grenertlaw.com
                              Counsel For Plaintiff